## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KEVIN J. B.,

              Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

              Defendant.

Case No. 21 C 6781

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Kevin J. B. seeks to reverse the final decision of the Acting Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB"). The Acting Commissioner moves for summary judgment affirming the decision. For the following reasons, the Court affirms the ALJ's decision.

## BACKGROUND

Kevin alleges disability since March 1, 2010 due to spinal stenosis, hypoxic ischemic encephalopathy, PTSD, nerve compression damage to hand function and strength, and status post spinal fusion. Born in 1967, Kevin was 42 years old on his alleged amended onset date of March 1, 2010. Kevin has a history of two cervical spinal surgeries in February 2004 and November 2010, right elbow surgery in 2008, and left Achilles tendon surgery in 2009. Kevin also suffers from anxiety, depression, PTSD, and panic attacks. Besides surgeries, Kevin's treatment has included physical and occupational therapy, right elbow steroid injections, wrist splints, braces to keep his hands open, and various medications, including Lyrica, Gabapentin, Amitriptyline, Norco, Valium, Seroquel, Flexeril, Ambien, and Cymbalta. Kevin completed high school and some college courses. He has previously worked as fitness instructor, warehouse worker, car

salesman, telemarketer, store associate, and pizza delivery driver. Kevin last worked part-time in November 2010 as a fitness instructor. The relevant period here is March 1, 2010 (the amended onset date) to March 31, 2011 (the date last insured).

On May 13, 2020, this Court reversed and remanded the ALJ's decision to reevaluate Kevin's alleged symptoms and limitations. *Kevin B. v. Saul*, 2020 WL 2468131 (N.D. Ill. May 13, 2020). On remand, the administrative law judge ("ALJ") held a new hearing and issued a written decision on October 20, 2021, again denying Kevin's application. (R. 1384-1405, 1416-39). The ALJ concluded that Kevin's degenerative disc disease and residuals of cervical spine surgery including plexopathy, neuritis, chronic pain, depression, and anxiety were severe impairments but did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 1386-89. The ALJ specifically considered Listings 1.02, 1.04, 11.14, 12.04, and 12.06. *Id*. at 1387-89. Under the "Paragraph B" analysis, the ALJ found that Kevin had moderate limitations in the four functional areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id*.

The ALJ then determined that Kevin had the residual functional capacity ("RFC") to perform a reduced range of sedentary work except he: (1) can occasionally push or pull with either upper extremity; (2) can occasionally climb ramps and stairs; (3) can occasionally stoop, kneel, balance, crouch and crawl; (4) can never climb ladders, ropes or scaffolds; (5) can perform gross manipulation frequently but not constantly; (6) is incapable of forceful grasping or torquing; (7) can perform fine manipulation occasionally but for no more than 10 minutes without interruption; (8) is incapable of precision fine manipulation and precision feeling; (9) has no limitation on his ability to reach up to 75% of the normal range in all directions; (10) can reach 75% to 100% of normal range of motion in all directions including overhead only occasionally and only while

bearing less than 10 pounds; (11) is limited to working in non-hazardous environments; (12) is limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of simple judgment; (13) can work at an average production pace, but not at a significantly above average or highly variable pace; and (14) is unable to work in crowded, hectic environments. (R. 1389-1403). The ALJ found that Kevin has no past relevant work. *Id.* at 1403. Based on the vocational expert's testimony, the ALJ determined that Kevin was not disabled because he can perform sedentary jobs existing in significant numbers in the national economy, including call out operator, surveillance systems monitor, and cutter and paster. *Id.* at 1403-04.

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.

A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Kevin raises three challenges to the ALJ's latest decision. Kevin first argues that the ALJ erred by repeating his prior analysis of Kevin's subjective symptom allegations and failing to correct any of the errors which this Court previously remanded. Kevin's second argument is that the ALJ's RFC assessment fails to sufficiently account for his standing and walking limitations. Third, Kevin contends that the ALJ failed to consider the effects of non-exertional limitations resulting from his chronic pain on his ability to work full-time. The Court finds that the ALJ did not commit reversible error and his decision is supported by more than a mere scintilla of evidence.

## A.    Subjective Symptom Assessment

Kevin argues that the ALJ committed the same errors that the Court previously identified in discounting his subjective symptom allegations. In evaluating subjective allegations, an ALJ assesses the objective medical evidence and a number of other factors, including the claimant's

daily activities, effectiveness and side effects of any medication, treatment, other methods to alleviate symptoms, and factors that precipitate and aggravate symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. § 404.1529(c). "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). As the Seventh Circuit has stated, "[p]atently wrong is a high threshold—'only when the ALJ's determination lacks any explanation or support . . . will [we] declare it to be 'patently wrong' and deserving of reversal.'" *Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021) (citations omitted).

Here, the ALJ concluded that Kevin's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 1392-93). Overall, the ALJ found that the objective medical record, including Kevin's improvement in response to treatment and medication, the findings of the state agency consultants, the February 2017 assessment of neurosurgeon Christopher DeWald, M.D., and Kevin's daily activities supported significant limitations with regard to the use of his bilateral upper extremities and hands but failed to support that he was totally disabled. *Id.* at 1403. As further discussed below, because the ALJ sufficiently explained and supported his subjective symptom assessment, the record does not compel reversal.

The Court turns first to the objective medical evidence the ALJ considered as part of his subjective symptom evaluation. An ALJ may not disregard an individual's symptom statements "solely because the objective medical evidence does not substantiate the[m]," but he "must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529(c)(2). The

ALJ permissibly considered Kevin's statements concerning his subjective symptoms and the extent to which the objective medical evidence supported the degree of severity alleged. (R. 1390-1400). Kevin says it is unclear where the ALJ addressed the inconsistencies between his subjective allegations and the objective clinical findings. Doc. 8 at 9. The Court disagrees. A comparison of the two decisions by the ALJ shows that he added to his symptom assessment and analyzed such inconsistencies throughout his decision. *McCorkle v. Kijakazi*, 2023 WL 179983, at *3 (7th Cir. Jan. 13, 2023) ("We consider [the ALJ's] decision as a whole."). For instance, the ALJ found that the medical records did not document profound hand problems as of the alleged onset date of March 1, 2010. (R. 1393). The ALJ noted that an electromyogram and nerve conduction study of the arms in August 2010 showed median and ulnar nerve entrapment at the wrist and elbow, respectively, but there was no evidence of any radiculopathy. *Id.* Likewise, the ALJ found that after Kevin's November 2010 neck surgery, his ability to use his hands was not as impaired as he alleged. *Id.* at 1400. The ALJ noted that physical and occupational therapy records leading up to April 2011 documented generally normal strength of the upper extremities with good progress. *Id.* The ALJ acknowledged that 4/5 strength reflected some functional limitations but not the profound limitations Kevin alleged. *Id.* at 1400. The ALJ also noted that treatment records in July 2011 showed some ongoing hand weakness and difficulty with fine motor activities. *Id.* at 1395. The ALJ found that such weakness and difficulty with fine motor activities was significant but did not prevent Kevin from performing sedentary work with the manipulative restrictions incorporated into the RFC. *Id.* The ALJ further pointed out that Kevin testified that he has difficulty with standing and walking, but physical examinations indicated normal gait and strength of the lower extremities. *Id.* at 1392. Given these and other inconsistencies noted between Kevin's allegations

and the objective medical evidence, the ALJ adequately addressed how the medical evidence did not support the severity of Kevin's stated symptoms.

Kevin argues that the ALJ "cherry-picked" the medical record when he noted that Kevin's December 30, 2010 CT scan of his spine showed no obvious nerve compression. (R. 1393). Kevin notes that the CT scan also revealed bony fusion at C3-4 and bony changes of the spinous portions of the spinous processes of C6, C7, and T1, with marked left-sided degenerative facet arthropathy at C2-3. *Id*. at 573. Contrary to Kevin's argument, the ALJ did not improperly cherry-pick the evidence related to Kevin's December 2010 CT scan. Rather, the ALJ simply noted Dr. Dewald's statement that the CT scan showed no obvious nerve compression, which was apparently the most important aspect of the scan results to Dr. Dewald. *Id*. at 533, 1393.[1] Kevin does not deny the relevance of the finding, and "the ALJ does not err when he does not discuss every piece of evidence in explaining his determination." *Garza v. Kijakazi*, 2022 WL 378663, at *2 (7th Cir. Feb. 8, 2022).

Citing *Murphy v. Colvin*, 759 F.3d 811 (7th Cir. 2014), Kevin next argues that the ALJ improperly relied upon Kevin's improvement after his November 2010 neck surgery. An ALJ may consider the effectiveness of treatment and medication in evaluating the nature and severity of a claimant's subjective allegations. 20 C.F.R. § 404.1529(c)(iv), (v); *see also* SSR 16-3p, 2017 WL 5180304, at *8. Kevin asserts that "[i]mprovement is of limited value." Doc. 8 at 12. The Court rejects that argument. "While [Kevin] is correct that the relevant question is not whether he has improved, but whether he can sustain full time employment, improvement *is* a relevant factor that ALJs may consider." *Dante B. v. Kijakazi*, 2022 WL 3926050, at *9 (N.D. Ill. Aug. 31, 2022).

---

[1]     Dr. Dewald's note dated January 10, 2011 states: "I reviewed Kevin's CT scan. The foramen actually looks fairly wide and I am pleased with it. I don't see any obvious nerve compression here. I think it's matter of giving this more time to resolve, and possibly have him see the hand doctors again for his distal issues." (R. 533).

The Seventh Circuit explicitly noted as much in the *Murphy* case cited by Kevin. *Id*; *Murphy*, 759 F.3d at 819 ("The key is not whether one has improved (*although that is important*), but whether they have improved enough to meet the legal criteria of not being classified as disabled") (emphasis added).

Here, the ALJ cited Kevin's improvement as evidence which contradicted his testimony and diminished the weight afforded it. (R. 1391, 1392, 1394, 1396, 1403). Kevin testified that he did not receive any relief from his November 2010 neck surgery and that he felt like his hands were on fire. *Id*. at 870-73, 1391. However, the ALJ found that Kevin's testimony that he did not receive any relief from his November 2010 surgery was not entirely consistent with the treatment records indicating improvement in left upper extremity/hand strength, activity tolerance, and sensory functions with the ability to drive, prepare light meals, and perform self-care activities of daily living independently. *Id*. at 1391. The ALJ's conclusion is supported by the record. For example, the ALJ noted that in December 2010, Kevin reported an improvement of the left upper extremity/hand strength, activity tolerance and sensory functions compared to the right upper extremity since the surgery. *Id*. at 457, 1393. Kevin further reported that he was able to: (1) perform self-care and activities of daily living independently but had difficulty with fasteners such as buttoning and tying shoes; (2) perform light meal preparation but required assistance for cutting meat and opening small packages such as sugar packets; and (3) drive but used both hands when opening doors and manipulating the care ignition and transmission shifter. *Id*. at 475, 460, 1393. Likewise, the ALJ noted that in January 2011, an occupational therapist observed improved sensory and fine motor dexterity of bilateral hands and added that Kevin's "overall function ha[d] steadily improved," despite constant symptoms. *Id*. at 535, 1393. As the ALJ also pointed out, a physical therapy progress note from February 2011 indicated that Kevin had made noticeable gains

in upper extremity strength, except for his hands. *Id*. at 712, 713. Further, physical therapy progress notes between December 2010 and February 2011 showed generally normal strength of the upper extremities and reflected good progress. *Id*. at 696, 699, 703, 709, 711-12, 1400. Moreover, in October 2011, Kevin reported that his bilateral hand pain was constant but tolerable with his current pain medication regime. *Id*. at 758, 1395; *Prill v. Kijakazi*, 23 F.4th 738, 752 (7th Cir. 2022) ("the applicable question is whether the pain medications controlled [the claimant's] symptoms."). A month later, Kevin demonstrated 5/5 strength in the upper extremities except for 4/5 strength in the biceps and deltoid muscles and was able to actively extend his fingers fully, although with pain. (R. 752, 1396).

Kevin cites the March 17, 2011 consultative internal medicine examiner's findings of markedly impaired gross and fine manipulation with both hands and markedly decreased range of motion of the cervical spine to suggest a lack of improvement in his symptoms after the November 2010 surgery. (R. 578).[2] However, the state agency physician Dr. Charles Wabner considered the March 2011 consultative examination when reviewing and analyzing Kevin's medical records. In reaching his conclusion that Kevin could perform light work with frequent climbing of ladders, ropes, or scaffolds and limitations to occasional handling and fingering bilaterally, Dr. Wabner relied on the results of the March 2011 consultative evaluation and a physical therapy treatment record showing that Kevin's left upper extremity and hand strength had improved and he was independent in self-care and activities of daily living. (R. 624-31); *see also id.* at 692-94. The ALJ accorded great weight to this opinion but he did not rely solely on the state agency consultant's

---

[2]    Kevin also points to notes from physiatrist Sachin Mehta, M.D., in October 2011 and a pain specialist in May 2012, both post-dating the March 31, 2011 date last insured ("DLI"), to show that he did not improve after his November 2010 surgery, but the ALJ noted other post-DLI evidence from November 2011 and May 2012 which indicated improvement in Kevin's condition. Doc. 8 at 12; (R. 1396) (citing 752, 779, and 782).

findings.[3] *Id.* at 1401. The ALJ assessed later submitted evidence in reaching his more restrictive RFC determination. *Id.* Notwithstanding the evidence cited by Kevin, the Court concludes that more than a mere scintilla of evidence supports the ALJ's finding that the objective evidence of improvement suggested that Kevin was not as limited as he claimed. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").

Kevin also objects that the ALJ relied on his failure to pursue additional occupational therapy in April 2011, telling Dr. Mehta that "he feels like he is able to adapt to his weakness with the necessary adaptive devices at this time." (R. 641, 1400). SSR 16-3p states that an ALJ's symptom analysis should consider whether "the individual fails to follow prescribed treatment that might improve symptoms." SSR 16-3p, 2017 WL 5180304, at *9 (October 25, 2017). The ALJ stated that while Kevin's declining occupational therapy was "not found to imply that [he] was not experiencing valid symptomology, it is one factor suggesting that he was experiencing a satisfactory level of functioning, despite continued limitations." *Id.* at 1400. Kevin faults the ALJ for failing to consider "any number of legitimate reasons" for his failure to pursue occupational therapy and argues that "ALJs must explore any facts that explain such a decision." Doc. 8 at 11. Yet the ALJ expressly raised the issue of non-compliance at the hearing on remand, and Kevin's counsel assured the ALJ that "there's nothing in the record that shows non-compliance." (R. 1433-34). On remand, Kevin did not present any evidence showing why he declined more occupational therapy. Nor does Kevin present any evidence of what his reasons were for declining the additional therapy in his brief. Doc. 8 at 11. While an ALJ may not find symptom testimony inconsistent with record evidence based on a failure to seek treatment without considering reasons for not

---

[3]     Kevin does not challenge the weight the ALJ assigned to the state agency physical consultant's opinion or any other opinion evidence.

obtaining the treatment, that is not the case under the record here. SSR 16-3p, 2017 WL 5180304, at *9. Kevin provided an explanation for declining additional therapy which the ALJ considered— he did not feel he needed it because he believed he would be able to adapt to his weakness with adaptive devices. *Id.* at 641, 1400. Consequently, the ALJ considered Kevin's stated reason for declining further therapy and Kevin has not presented evidence that his declination of treatment was due to any other reason. In such circumstances, the ALJ's finding that Kevin's failure to pursue additional therapy is at least partially inconsistent with his complaints is not grounds for reversal.

Kevin next suggests that the ALJ improperly relied on his ability to drive, prepare light meals, and perform daily activities like personal care because such activities are not indicative of an ability to function in a full-time work setting. Doc. 8 at 11. To be sure, in assessing a claimant's statements about the extent of his symptoms, an ALJ may not "equat[e] activities of daily living with an ability to work." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). "But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." *Prill*, 23 F.4th at 748; 20 C.F.R. § 404.1529(c)(3)(i).

The ALJ appropriately considered Kevin's daily activities as one factor in assessing his subjective complaints of pain. Kevin stated that due to his spinal condition and pain, he has difficulty sitting or standing in one place for more than 10-15 minutes, cannot lift anything heavier than 1-2 pounds, and lacks hand function, strength, and dexterity to do normal hand activities. (R. 240, 262, 1390). He also reported a loss of short-term memory, which prevents him from remembering and retaining new information. *Id.* The ALJ partially accepted Kevin's allegations, finding that Kevin is restricted to a range of sedentary work with significant limitations in the use

of the upper extremities and additional postural, environmental, and mental limitations. *Id*. at 1392,1394, 1400.  However, the ALJ also relied on evidence that Kevin's activities of daily living suggested that he was not as limited during the relevant time period as he claimed.  For example, the ALJ considered that in December 2010, Kevin reported that he was able to perform self-care and activities of daily living independently but continued to have difficulty with fasteners such as buttons. *Id*. at 457, 1393.  The ALJ also noted that Kevin was able to perform light meal preparation and drive but utilized both hands when opening doors and manipulating the car ignition and transmission shifter. *Id*. at 457, 460, 1393.  Further, the ALJ noted Kevin's testimony that he was still working as a fitness instructor at the time of his amended alleged onset date in March 2010 and continued to work until November 2010, although he was having shooting pain in his hands and only working one to four hours per week. *Id*. at 870-72, 1391.  The ALJ observed that in 2010 and 2011, Kevin was able to drive 3-4 times per week, to work and to the store. *Id*. at 889-90, 1392.  Kevin also testified that he was able to perform self-care independently but had difficulty shaving. *Id*. at 889, 1392, 1423.  Also, Kevin testified that he is able to drive for a half an hour and drove himself to the February 2017 hearing. *Id*. at 890-91, 1392.  So substantial evidence supports the ALJ's finding that Kevin described problems using his hands but admitted to an ability to drive, prepare light meals, and perform daily activities during the relevant time period, albeit with limitations and adaptations. *Id*. at 1400.[4]

The ALJ appropriately considered Kevin's activities of daily living in assessing his symptoms, and he explicitly acknowledged that those activities did not equate to an ability to

---

[4]      As further evidence of daily activities inconsistent with Kevin's alleged disabling limitations, the ALJ considered that Kevin reported regularly going to church and visiting with neighbors in the summer but stated that social situations were sometimes awkward due to memory problems. (R. 244-45, 266-67, 1390).  The ALJ also noted that Kevin reported that he would run for a half an hour between March and November 2010. *Id*. at 873, 1391.  In his function reports, Kevin additionally stated that he could walk for a half an hour before needing to stop and rest. *Id*. at 245, 267.

perform full-time work. (R. 1390, 1392, 1400); *Burmester v. Berryhill*, 920 F.3d 507, 510-11 (7th Cir. 2019). As the ALJ explained, he considered Kevin's reported activities as one factor in determining that he had considerable limitations but was not totally disabled due to hand problems and other limitations as he alleged. (R. 1390, 1400). The Court finds no error in the ALJ's assessment of Kevin's daily activities. *Prill*, 23 F.4th at 748 ("The ALJ did not err in considering and weighing [the claimant's] self-reported daily activities, including gardening. Those daily activities were appropriately determined to be inconsistent with the severity and limitations of her claimed symptoms."); *Jeske v. Saul*, 955 F.3d 583, 592-93 (7th Cir. 2020) ("Here, the ALJ did not reason that [the claimant's] activities of daily living are as demanding as those of full-time work. Rather, the ALJ considered [the claimant's] activities to determine whether her symptoms were as severe and limiting as she alleged.").

Kevin criticizes the ALJ's finding that the record contained "no functional capacity evaluation or doctor opinion of record as to [Kevin's] hand limitations exceeding those set forth in the residual functional capacity." (R. 1400). Citing Dr. DeWald's December 2012 clinic note, Kevin contends the ALJ's statement is untrue. The ALJ acknowledged Dr. DeWald's December 2012 opinion that Kevin was "completely disabled, unable to take a job because of his lack of his upper extremity" ability. *Id*. at 1170, 1402. The ALJ found Dr. DeWald's opinion "somewhat cursory" and that it failed to provide specific functional limitations. *Id*. at 1402. Kevin is correct that the ALJ's statement was not completely accurate. Contrary to the ALJ's characterization, Dr. DeWald did state that Kevin had lost his ability for fair or fine motor control and the ALJ did not fully account for this limitation in the RFC.[5] Although the ALJ was not entirely accurate in

---

[5]    In the RFC, the ALJ found that Kevin was incapable of precision fine manipulation and precision feeling, but he also found that Kevin could perform fine manipulation occasionally and for no more than 10 minutes without interruption. (R. 1389).

describing Dr. DeWald's statement, Kevin does not explain how that inaccuracy renders the ALJ's entire evaluation of his subjective symptoms patently wrong. As described above, the ALJ provided other valid reasons for not crediting Kevin's complaints of disabling symptoms.[6]

Finally, Kevin argues that the ALJ improperly reiterated his personal observations of Kevin's ability to move his upper extremities at the February 2017 hearing. The Court agrees that the ALJ erred in this respect. The law of the case doctrine "instructs that an administrative agency must 'conform its further proceedings in the case to the principles set forth in the [appellate] decision.'" *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (quoting *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998)); *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020). In evaluating the ALJ's decision from August 3, 2017, the Court noted that an ALJ "may not discredit a claimant's testimony simply because the claimant failed to 'sit and squirm.'" *Kevin B.*, 2020 WL 2468131, at * 13 (quoting *Flores v. Massanari*, 19 F. App'x 393, 404 (7th Cir. 2021)); *see also Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (noting discomfort with "sit and squirm" test in determining credibility and "doubt[ing] the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort.") (emphasis in original). In the prior appeal, the Court found the ALJ's use of the disfavored "sit and squirm" test to discount Kevin's pain allegations "especially unsettling" and irrelevant given that the hearing took place nearly six years after the end of the relevant time period. *Kevin B.*, 2020 WL

---

[6]     Moreover, as this Court previously found, the ALJ reasonably gave Dr. DeWald's December 2012 statement some weight because the "record supports that [Kevin] has ongoing hand limitations." (R. 1402); *see Kevin B.*, 2020 WL 248131, at *11. The ALJ also correctly gave no significant weight to Dr. DeWald's statement that Kevin was disabled. 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision on whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *see Kevin B.*, 2020 WL 248131, at *11.

2468131 at *13-14; *see also id.* at *6 n.7. The Court's prior decision on this issue was binding on the ALJ.

On remand, however, the ALJ included the exact same hearing observations of Kevin's movements previously rejected by this Court, claiming that his comments "do not constitute use of the sit/squirm test, but rather indicate the inconsistencies between [Kevin's] subjective allegations and the decision-maker's observations."[7] (R. 843, 1400). The law of the case doctrine prevented the ALJ from relying on his personal observations of Kevin's movements at the prior hearing to discredit his pain allegations. While the ALJ may have disagreed with the Court's analysis, he was not free to ignore the Court's finding that his personal observations of Kevin "reek[] of the disfavored 'sit and squirm test'" and to conclude on remand that his personal observations did not constitute use of the sit and squirm test. Although there are exceptions to the law of the case doctrine, the Commissioner has not argued that any of them are present here. Indeed, the Commissioner acknowledges that the ALJ should have "edited his decision more carefully so as to remove his statement at AR 1400 about his observations at the hearing." Doc. 16 at 9.

Nonetheless, the Commissioner argues that the ALJ did not predicate his adverse subjective symptom finding on these observations. The Commissioner points out that earlier in the decision, the ALJ stated that in light of this Court's remand order, he was "not relying upon [his]

---

[7]     In his August 3, 2017 and October 20, 2021 decisions, the ALJ stated:

>  At the hearing, the claimant was observed to be able to reach the table in front of him as well as to the sides, but he testified that this would be painful if he tried to reach further. He was also able to open his hand but stated that this was painful. I acknowledge that the claimant shifted his shoulders while seated, but did so fluidly giving no sign of pain. Additionally, he was able to testify clearly and appropriately without evidence of pain behavior.

(R. 843, 1400).

observations of [Kevin] as a factor in assessing his subjective allegations." (R. 1391). It is true that the ALJ made this statement. But to be clear, the ALJ violated the law of the case doctrine by later relying on "inconsistencies between [Kevin's] subjective allegations and [his] observations" to discount Kevin's claims of disabling limitations and pain. *Id.* at 1400. Despite this error, the ALJ's remarks regarding his personal observations do not amount to reversible error because "[n]ot all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (emphasis in original). The ALJ expressly noted that his personal "observations are but one minor factor among many factors contributing to my conclusions." (R. 1400). Moreover, the ALJ offered several other valid reasons, supported by substantial evidence, for discounting Kevin's symptom allegations. The other relevant evidence supporting his symptom assessment, included but was not limited to, inconsistency with the objective medical record, treatment, medications, the findings of the state agency consultants, and his various activities of daily living. In addition, the ALJ credited some of Kevin's statements when he limited him to sedentary work with significant limitations in the use of the upper extremities and additional postural, environmental, and mental restrictions. Taken together, this evidence provides substantial evidence supporting the ALJ's partially adverse credibility finding. Accordingly, to the extent the ALJ considered his hearing observations of Kevin, it was a small factor in his consideration of all the evidence and is not a reversible error. *Malone v. Berryhill*, 2018 WL 6528014, at *9 (N.D. Ill. Dec. 12, 2018) ("[B]ecause the ALJ's observations of [claimant] during the hearing were only one factor in the ALJ's credibility determination, the Court does not find it requires remand.").

**B.     RFC Determination**

Kevin also challenges one aspect of the ALJ's physical RFC assessment—the standing and walking limitations.  The RFC is the "most physical and mental work the claimant can do on a sustained basis despite [his] limitations." *Madrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). In reaching his RFC assessment, the ALJ must "articulate at some minimal level [his] analysis of the evidence." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  Ultimately, "an ALJ need only include limitations [in the RFC] that are supported by the medical record." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022).

According to Kevin, the ALJ failed to support the conclusion that he has no limitations in his ability to stand or walk.  Kevin is referring to the bold heading of subpart five in the ALJ's decision. (R. 1389).  Reading the remainder of the ALJ's decision, however, it is evident that the ALJ's statement that Kevin "has no limitations in his ability to sit, stand, walk throughout an 8 hour workday" constituted a typographical error. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole . . . .").  Following his functional analysis set forth in the narrative part of subpart five, the ALJ found that Kevin's "impairments would limit him to a reduced range of *sedentary* work with postural and environmental limitations and limitations in the use of the upper extremities." *Id*. at 1399 (emphasis added); *see also id*. at 1395 ("Such weakness and difficulty with fine motor activities is significant, but would not prevent the claimant from performing *sedentary* work that involved" the manipulation limitations included in the RFC) (emphasis added).  In his narrative explanation of the RFC finding, the ALJ never stated that Kevin could stand and walk without limitation.  Moreover, the ALJ confirmed that he found Kevin limited to a range of sedentary work when he discussed his step-five finding, stating:

> Through the date last insured, if the claimant had the residual functional capacity
> to perform the full range of *sedentary* work, a finding of "not disabled" would be

17

> directed by Medical-Vocational Rule 201.07. However, the claimant's ability to
> perform all or substantially all of the requirements of this level of work was
> impeded by additional limitations. To determine the extent to which these
> limitations erode the unskilled *sedentary* occupation base . . . .

*Id.* at 1404 (emphasis added). The reference to no limitations in the ability to stand or walk also

appears to be a typographical error because the ALJ adopted the opinion of the vocational expert

who opined that Kevin could perform the sedentary jobs of call out operator, surveillance systems

monitor, and cutter and paster. *Id.* at 899-90, 1404. Viewing the decision as a whole, it is clear

that the ALJ restricted Kevin to a range of sedentary work, which by definition involves no more

than about two hours of total standing and walking in an eight-hour workday. 20 C.F.R. §

404.1567(a); SSR 83-10, 1993 WL 31251, at *5 (1983). Thus, the Court concludes that the ALJ's

mistake in stating that Kevin had no limitations in standing or walking in a workday was a harmless

typographical error and the result would be the same even if the case was remanded for the ALJ

to fix his editing error. *Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021) ("To the extent the

ALJ did misspeak, any error was harmless."); *James P. v. Kijakazi*, 2022 WL 1908892, at *7 (N.D.

Ill. June 3, 2022) (declining to remand where ALJ "reiterate[d] in bold the somewhat inartful RFC

of 'no limitations in the total amount of time [claimant] was able to sit, stand, or walk throughout

an 8 hour workday,'" but the rest of the decision clarified that he intended to limit the claimant to

light work, which involves standing and walking for only 6 hours in an 8-hour workday).

Moreover, the ALJ's finding that Kevin could perform the standing and walking

requirements of sedentary work is supported by substantial evidence. The ALJ acknowledged

Kevin's testimony that pain in his hands caused him to lie down more than 50% of the day and

that the pain increases the longer he is up, but he found that the medical record did not corroborate

Kevin's testimony. (R. 1392); *see also id.* at 1390-91 (ALJ noting "medical records do not support

. . . the need to lie down"). The ALJ cited evidence supporting his conclusion that Kevin could

stand and walk up to two hours per workday during the relevant time period, including examinations that showed normal gait and strength in both legs. *Id*. at 1392. For example, the ALJ cited Dr. DeWald's September 7, 2010 exam, which found that Kevin was able to toe and heel walk without difficulties and bilateral lower extremity strength hip flexors, quadriceps, EHL, dorsiflexion, and plantarflexion were 5/5. *Id*. at 415, 1392. Similarly, in March 2011, consultative examining physician Roopa Karri, M.D., observed that Kevin could get on and off the exam table, walk 50 feet without support, heel/toe walk and squat, and tandem gait. *Id*. at 577, 1392, 1394. Kevin also had 5/5 strength in the lower limbs, full range of motion of the lumbar spine, hips, knees, and ankles, and a negative straight-leg raise test. *Id*. at 578, 1392, 1394. That same month, Dr. Mehta noted bilateral lower extremity strength of 5/5 throughout with normal range of motion and intact vibration and proprioception in the lower extremities. *Id*. at 596, 1394.

Additionally, the state agency medical consultants opined that Kevin could stand and/or walk for six hours in an 8-hour workday. (R. 625, 692-94). The ALJ afforded the initial state agency medical consultant's opinion "great weight," noting that he based his opinion on the consultative evaluation findings and physical therapy records. *Id*. at 625, 631, 1401. However, the ALJ found that evidence received after the initial state agency physician reviewed the record supported greater restrictions in the RFC, including limiting standing and/or walking to up to two hours in an 8-hour workday. *Id*. at 1401. The state agency physicians' assessments provided further support for the standing and walking limitations in the RFC. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (RFC that is "more limiting than that of any state agency doctor or psychologist, illustrat[es] reasoned consideration given to the evidence [claimant] presented."). The ALJ further pointed out that no physician stated that Kevin had to lie down more than 50% of the day. *Green v. Saul*, 781 F. App'x 522, 528 (7th Cir. 2019) ("The RFC does not mention that

[the claimant] naps for two hours every day, but this requirement is not supported by evidence other than her testimony, which the ALJ did not credit."); *Imse v. Berryhill*, 752 F. App'x 358, 360-62 (7th Cir. 2018) (ALJ properly disregarded claimant's testimony of needing to lie down where "no physician, treating or otherwise, has ever indicated that there was a medical reason why she would need to lay down/nap as frequently as alleged during the day."). As the ALJ also correctly noted, Kevin did not mention needing to lie down more than 50% of the day to any physician. (R. 1392). Finally, the ALJ noted that Kevin testified that between March and November 2010, he would run for half an hour and only that his hands hurt in doing so. *Id.* at 873, 1391. All of this evidence supports the ALJ's RFC finding that Kevin could stand and walk up to two hours in a workday, so there is no reversible error.[8]

Lastly, Kevin contends that the ALJ did not consider how his chronic pain impacted his ability to meet the non-exertional demands of full-time work. As Kevin correctly notes, non-exertional limitations can be imposed by symptoms, such as pain. 20 C.F.R. § 404.1569a(a), (c). The ALJ incorporated multiple non-exertional mental limitations into his RFC determination, including restrictions to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, work requiring the exercise of only simple judgment, work at an average production pace but not at a significantly above average or highly variable pace, and no work in crowded, hectic environments. (R. 1389). Kevin insists that his "mental impairment, combined with multiple severe physical impairments, including chronic pain, impact his ability to remain on task sufficiently to sustain non-exertional work-related activities, five days per week, eight hours per day." Doc. 8 at 14. Kevin's argument

---

[8]     Although not during the adjudicated period between March 1, 2010 and March 31, 2011, Kevin reported to his primary care physician in January 2013 that he lost 60 pounds and was walking four miles daily. (R. 1180, 1397). Moreover, at his annual exam in April 2014, Kevin stated that he took two walks daily but if he was out too long he would get hand clawing. *Id.* at 1184, 1397.

fails because he does "not identify or point to evidence of any functional limitations the ALJ should have imposed that would take proper account of his mental impairments." *Truelove*, 753 F. App'x at 397; *see also Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address [claimant's] limitations in concentration, persistence, or pace because he hypothesizes none."). The only evidence Kevin cites to is a January 2017 letter from his therapist, but he does not explain how the letter supports additional non-exertional functional restrictions beyond those found by the ALJ. Doc. 8 at 14. Moreover, the ALJ based his finding as to Kevin's mental RFC on the opinion of the state agency psychologist. (R. 606-22, 1401, 1403); *see also id.* at 692-94. The state agency psychological reviewers' opinions provide substantial evidence to support the ALJ's mental RFC finding because the opinions were generally consistent with the mental health treatment records. *Prill*, 23 F.4th at 751. Therefore, the ALJ did not err by failing to impose additional non-exertional limitations in the RFC.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's request for reversal and remand [8] is denied, and the Commissioner's motion for summary judgment [15] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: May 30, 2023

_____
Sunil R. Harjani
United States Magistrate Judge